McCORMACK, Respondent, v. HERBOTH, Appellant.

St. Louis Court of Appeals, November 14, 1905.

1. **PRACTICE: Instruction.** In an action for services rendered by plaintiff to the defendant, in estimating damages to the defendant's building by fire and in adjusting the loss thereon with an insurance company, where the evidence tended to show an agreement to compensate plaintiff for making the estimate but did not tend to show any agreement to employ plaintiff to adjust the loss, it was error to submit the case to the jury under instructions which authorized them to award compensation for the adjustment.

2. ———: **Evidence.** And in such case it was error to permit evidence of the reasonable value of services of a person employed to estimate a loss and then adjust it with the insurance companies.

3. ———: ———. And in such case it was error to permit the insurance adjustor to state his conclusion that the plaintiff was acting for the defendant in estimating the loss from the production and acceptance of the plaintiff's estimates in the presence of the defendant, where nothing was said which would tend to evoke a protest from the defendant against the right of the plaintiff to represent him.

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey,* Judge.

REVERSED AND REMANDED.

*John A. Gilliam* for appellant.

*Stern & Haberman* for plaintiff.

GOODE, J.—This case originated before a justice of the peace on the following statement:

"Charles Herboth.—Before Hon. James J. Spaulding, justice of the peace, Fifth district, St. Louis, Missouri: Charles Herboth to Charles B. McCormack, Dr.: For services in the matter of estimating fire damages on building owned by said Herboth and occupied by American Radiator Company, and in adjusting the fire loss on same, said services being rendered at the special instance and request of defendant, $150.00; for which sum of one hundred and fifty dollars plaintiff prays judgment against defendant with costs.—Stern & Haberman, attorneys for plaintiff."

The answer was an oral denial of the plaintiff's cause of action and on this answer the cause was tried both in the magistrate's and the circuit court. In the latter tribunal the plaintiff obtained judgment for $150 and defendant appealed to this court.

It will be observed that the services constituting the basis of the claim are stated in the complaint or account to have consisted of estimating the fire damage to a building owned by the defendant and adjusting the fire loss on the same. It is stated, too, that both services were rendered at the special instance and request of the defendant. The trial court followed those statements regarding the services in the instructions to the jury. In order for a verdict to be returned for the plaintiff, the jury were told that they must find plaintiff had been employed by the defendant to estimate the loss by fire to defendant's building and to adjust said loss with the insurance companies; and find, too, that plaintiff rendered both services; that is, that he both estimated and adjusted the loss.

We are particular in calling attention to this point, because an attentive study of the evidence has convinced us that the testimony adduced by plaintiff tended to prove he was employed to estimate the loss, but not that he was employed to adjust it with the companies. The reason for this conclusion can be made plain only by quoting the material portions of the testimony bearing on the alleged contract between the parties. The defendant contends, and supports the contention by his oath, that he never employed plaintiff to render either service; but, instead, employed another man named Lemburg to estimate the loss.

Plaintiff is a contractor and builder in the city of St. Louis and has been for twenty-eight years. Lemburg is a builder, too. The fire occurred in April, 1904. The main building damaged was owned by the defendant; but the premises had been occupied as a place of business by the American Radiator Company ever since the building was erected and the said company had built additions to the main building and owned those additions. The plaintiff, as contractor, constructed the house and the additions; the house for one Bonsack, who owned the premises prior to Herboth's ownership, and the additions for the American Radiator Company. The latter were built during the eight or ten years preceding the fire. The additions belonging to the radiator company and on which it carried insurance, were damaged by the fire and said company was entitled to be reimbursed for its loss by the insurance companies. The main building belonging to the defendant Herboth, was also damaged and he was entitled to reimbursement by the companies. As McCormack had been in the habit of making repairs for the radiator company, the manager of that company telephoned him after the fire to come to the plant and "estimate the damage." Plaintiff said that when he went to the plant he met Mr. Herboth and told the latter of his (plaintiff's) employment by the radiator company and that as he had built the

building for Bonsack and had made improvements for the tenant, he was in a better position than any one else to tell where the property of the owner, Herboth, left off and that of the tenant, the radiator company, began, and it would be to Herboth's interest to employ him, too. We will quote plaintiff's testimony as to the arrangement between him and Herboth:

"Q. What conversation took place between you and Mr. Herboth respecting this matter? A. I told Mr. Herboth I had been called in to make an estimate of the damages for the American Radiator Company and that I had been out there in the morning and met the insurance adjusters there, and they told me that if I would submit figures to them, they would most likely accept my figures, and I told him that as I had built the building for the owner, and I had made the improvements for the tenant, that I thought I was in better position to tell where the owners of the property left off and the tenants of the property began, or vice versa, and I thought it would be to his interest to employ me to represent him, and he said he thought so too, and says: 'You go ahead.' Q. He told you to go ahead? A. Yes, sir. Q. Did you then proceed to ascertain the extent of the loss to this property? A. I did."

Some gentlemen who were in the factory at the time representing the insurance companies, heard part of this conversation; that is to say, heard McCormack's proposal to Herboth; but did not hear the latter tell McCormack to go ahead; and as to this reply the case rests on plaintiff's own testimony. Herboth testified like McCormack, in regard to the latter's proposition; but in regard to the answer to it, Herboth said he told McCormack that his (Herboth's) real estate agent (a man named Bersch) had already engaged some one else to come out and estimate Herboth's loss and he would have to see about that engagement before he employed McCormack. McCormack swore Herboth then and there called Bersch by telephone and told him not to send the

other contractor to make an estimate. In point of fact the other man (Lemburg) was at the plant for the purpose of making an estimate, either before or after the conversation between McCormack and Herboth. The testimony of Herboth is that he never engaged McCormack's services, either at the time of the conversation mentioned, or subsequently; but was aware McCormack was making an estimate of the damages to Herboth's building, but supposed it was being done in behalf of the insurance companies. The latter statement looks rather improbable.

Now the essential point, as we see the case, is this: Granting that McCormack's statement that he was told to go ahead by Herboth was true, what did Herboth's order to go ahead mean? In other words, what did Herboth intend plaintiff should do? This turns on what he had proposed to do; because, according to his own testimony, Herboth's answer was for him to go ahead and do what he had offered to do. Immediately preceding his statement of his conversation with Herboth, McCormack stated that the American Radiator Company had sent for him to come out to the plant and estimate its damage; and that he was employed by that company "to estimate the damage." It will be observed that McCormack said he told Herboth that he had been called in to make an estimate of the damages for the American Radiator Company; that he had been out there that morning and met the adjusters who told him if he would submit figures they would probably accept them. He also told Herboth that on account of his familiarity with the building and improvements, he was in a better position to tell about the damage to the parts owned by the respective owners, and for that reason it was to Herboth's interest to employ him; and, thereupon, Herboth did employ him. It is obvious, therefore, that Herboth employed McCormack to render a similar service to the one McCormack said the radiator company had already employed him to render for it, namely; make an

estimate of damages. It is to be kept in mind that plaintiff was hired by Herboth to do what he (plaintiff) *said* the radiator company had hired him to do for it; not necessarily what he actually did for it. Hence, though he may have adjusted for the radiator company, it does not follow that he was hired to adjust for Herboth. McCormack prepared a diagram of the building, showing the injured portions and estimating the cost of repairs. We quote further portions of the testimony, indicating what the agreement between the parties was. McCormack swore he had had a great deal of experience for twenty years in appraising fire losses and estimating values for insurance companies, as well as for the insured. His testimony proceeded on cross-examination, as follows:

"Q. Now I think you said that you told Mr. Herboth that you had been called to make an estimate for the American Radiator Company and the insurance adjusters told you they would probably take your figures? A. Yes, sir.

"Q. That was because you were perfectly well known to the insurance-adjusters? A. Yes, sir.

"Q. And worked for them a great deal? A. Yes, sir, they had confidence in my figures.

"Q. And they told you before you made the estimate that they would probably take your figures? A. Yes, sir.

"Q. You never had seen Mr. Herboth before that day? A. I don't think so.

"Q. And you say that you told Mr. Herboth in the presence of Mr. Corby, Mr. Hem and Mr. Bond that you thought you were the proper party to make the figures for him? A. I think those gentlemen besides Mr. Bond were present when I made that remark. . . .

"Q. Now did not Mr. Herboth tell you there that he was going to take bids and that he had telephoned Mr. Bersch to have a man come out and figure on the property? A. No, sir, he told me that Tuesday.

"Q. You say that he did not tell you that on this first day in the presence of Mr. Corby? A. No, my recollection is that he told me that the insurance agent had sent out another builder.

"Q. Who told you that? A. Mr. Herboth. He didn't say anything about making an estimate, but he went to the telephone and countermanded Mr. Bersch's instructions for the man to come out there. (That question and answer referred to the job of repairing the building.) . . .

"Q. Did Mr. Herboth tell you at that time in the presence of Mr. Corby that the lowest bidder would get the job? A. No, sir, for the reason that if he had I would not have taken hold of his case to have made the appraisal. . . .

"Q. Is it a fact that you would not make an estimate to make repairs on a building that has been burned? A. Why, certainly, I will make an estimate if I am employed to do so."

McCormack hoped to get contracts to repair the building from both the radiator company and Herboth, and swore that if he had gotten a contract from either, he would have charged the party hiring him nothing for his services in appraising the loss. In this connection he testified as follows:

"Q. That if you got the job from both of them you expected to get $400 for your estimate, and you expected to make $523.52 for your ten per cent profit, making $923.52? A. No, you are mistaken. If I had gotten the work there would be no charge for my services.

"Q. What? A. I say if I had gotten the work there would be no charge for making the estimate. I never charge for making an estimate when I do the work. If the contract had been awarded to me to repair the building, I would not have charged anything for my services as an appraiser."

He likewise gave this testimony:

"Q. Mr. Gilliam has brought out the fact that you have been paid $250 by the American Radiator Company? A. Yes, sir.

"Q. That was for your services for estimating and ascertaining the extent of the loss so far as it affected them? A. Yes, sir.

"Q. And your charge to Mr. Herboth was for the corresponding service performed for him? A. Yes, sir."

Plaintiff introduced several insurance adjusters to testify as to his competency to do the work he agreed to do. One of them swore as follows:

"Q. In what capacity have you known Mr. McCormack? A. As a builder and contractor.

"Q. Have you known him also as an estimator of fire losses? A. Yes, sir.

"Q. Have you ever employed him for that purpose? A. Yes, sir.

We think it is apparent from the above recital of the testimony, and there was none inconsistent with it, that plaintiff's own evidence went to show that he was employed by the defendant to do nothing but estimate and appraise the loss, and that the extent of his employment did not include adjusting the loss with the insurance companies. McCormack met the adjusters a few days later when the loss was settled, but Herboth was there representing himself. This was the only occasion on which the evidence tends to show an interview occurred between McCormack and the adjusters. The substance of the testimony of what transpired on that occasion was, that McCormack submitted his figures and the adjusters questioned some of them as too high, but finally accepted them and settled the loss according to them. In fact, there seems to have been no particular controversy about the settlement.

We hold the entire evidence has no tendency to prove any employment by McCormack to adjust defendant's loss with the insurance companies; and that,

hence, it was error to submit the case in such a way that the jury could award compensation for that service.

By reason of this ruling certain testimony which was admitted must be held to have been incompetent. Testimony was received tending to show what was the reasonable value of the services of a person employed to estimate a loss and then adjust it with the insurance companies. Inasmuch as plaintiff's employment did not extend to the latter item of service, the reasonable value of his services in estimating the loss was alone in issue.

One of the adjusters who settled the loss, testified concerning what transpired at the meeting when it was settled and about plaintiff's presence there. He was asked the following question by plaintiff's counsel:

"Q. You say that Mr. McCormack was representing Mr. Herboth?"

Here the defendant interposed the objection that the question called for a conclusion of law. The objection was overruled and an exception saved. This ruling appears to have been made on the ground that Mr. Herboth was present; but we do not see how his presence on the occasion entitled the witness to testify to a conclusion by the witness that McCormack was representing Herboth. It would have been proper to show that Herboth, though present, did not disclaim McCormack's right to represent him. But the testimony was not of that nature. In answer to the question the witness said:

"A. The papers were presented to me as the estimate, as I understood it, on the part of Mr. Herboth. That is all I know about it. Mr. McCormack presented them, as I understood, on the part of Mr. Herboth; and after examining it I accepted it as a correct estimate and settled the loss.

"Q. By the Court: Was Mr. Herboth there at the time? A. He was present at the time, yes, sir.

"Q. What, if anything, did Mr. Herboth say? A. Well, I do not recall anything he said."

It will be observed that the witness did not state that McCormack said anything about representing Herboth which would tend to evoke a protest from the latter if, in truth, McCormack had no right to represent him. Neither did the witness state that Herboth said anything about McCormack representing him. Therefore, it does not appear that McCormack made any statement that he represented Herboth, or that the latter made any such statement. It follows that the witness was allowed to give his own conclusion about the matter without furnishing facts which would warrant such a conclusion. Under those circumstances the conclusion of a witness about a matter of fact which is in issue is incompetent, and may influence the jury's conclusion. It is to be borne in mind that this testimony went directly to the main issue of fact; namely, whether McCormack had been employed by the defendant.

The judgment is reversed and the cause remanded. All concur.